ARKANSAS POWER & LIGHT COMPANY *v.* LEWIS.

Opinion delivered January 21, 1929.

*Robinson, House & Moses,* for appellant.

*Dave Partain, G. C. Carter* and *Patterson & Patterson,* for appellee.

McHANEY, J. In June, 1921, appellant, being the owner of the Denning Coal Company properties, entered into a lease agreement with W. H. Lewis and G. A. Sly, by which it leased to them "its coal mine located in Franklin County, near the town of Denning, known as the Denning Coal Company's mine, and all accessories, equipment, and appurtenances thereto, including engines, boilers, machinery, two mules, and such other equipment of every nature now used in the operation of said mine." The lease agreement made no reference to any particular mining lease it owned, and it and its precedessors had mined coal from the Russell & Butts lease, the Bourland lease and the Western Coal & Mining Company lease,

near Denning. Its lease to Lewis & Sly required them to operate the mine and to produce not less than one thousand tons of coal per month.

In 1922 appellee James A. Lewis, father of appellee W. H. Lewis, bought out the interest of Sly, and the property was thereafter operated by them. Appellees became delinquent in the payment of royalties of 15 cents per ton on coal mined from the lease of the Western Coal & Mining Company, and also delinquent in the payment to appellant of the stipulated sum of 35 cents per ton for the use of its mining equipment. In the latter part of November, 1924, on account of the alleged negligence of the appellees in the mining of coal from their lease, the Western Coal & Mining Company gave notice to appellant and appellees that, at a later date, they would ask for a temporary injunction restraining them from the further operation of their lease. Some time later, after their respective attorneys had consulted, a compromise agreement was reached between appellant and the Western Coal & Mining Company, whereby appellant would pay all back royalties due by appellees, and would agree to save the Western Coal & Mining Company harmless from improper or negligent operations of appellees in the future.

The Western company agreed to make a new lease, and appellees were notified that a new lease would be made, and to go ahead with the work of mining, which they did until the early spring of 1925, but neglected to pay any royalty to the Western company or appellant on the coal mined, and apparently ceased operations. Beginning in the latter part of 1923, and running through 1924 and up until May or June of 1925, the appellees were almost constantly complaining that they were losing money on their operations, asking for reduction in the royalties provided for in their lease contract, complaining of the bad price they were getting for coal, and asking appellant to come up, check them out and stop operations. For instance, in a letter dated November 10, 1924, they wrote appellants as follows: "Now, Mr. Garrett,

I think it would be better for you to send some one up here and set a price on your equipment, look the situation over and see what you have here, and put a price on it, so we can dispose of it when we mark what we can get, for we will be compelled to close down as soon as the price of coal goes down, as we have lost too much money already. I lost a thousand dollars last run, and we sure cannot lose any more.''

On April 4, 1925, they wrote appellant as follows: ''You will please find inclosed royalty report for February and March, but not any money. It does seem like that when we pay the labor and expense we have nothing left. Now, Mr. Baker, I don't see why we cannot get some adjustment on this royalty. If we cannot, we would be better to shut down and move the equipment. We cannot sell coal with the other mines in the field. * * * We think you all could cut your royalty to fifteen cents and the Western to fifteen and insurance five would make thirty-five cents, the highest in the field. But that will give us a chance to get into the market with other coal dealers. Now, Mr. Baker, think this over, and tell us now just what you are willing to do. If we cannot get some relief, we will be compelled to close down and find relief, or close down and get other work. Let me know right away, so as I can get out and hunt some business.''

Again, on April 6, they wrote appellant in part as follows: ''I am going to take another trip tomorrow and see what I can do, and if I cannot get some business, I will be compelled to seek other work and let the mining go, as we cannot afford to stay and lose any more money now.''

Under date of May 8, 1925, they wrote appellant in part as follows: ''Since arriving home I have been working to get some one to lease the mines. I have not got any one yet that wants to go in the mining business right now, as it is so dull there is not very much coal going out of this field at this time, only some very cheap coal, cheaper than we can produce it. * * * Now, Mr. Garrett, you all can use your best judgment about what

to do with your property here, as most coal men think that there will not be very much coal business for this field for some time. * * * Now, Mr. Garrett, let me hear from you as soon as you can, and I will keep trying to get some men to take the mines over and keep trying to get some business, and then I will have a better chance to work on a lease, as no one wants to lease a mine if he cannot work it.''

Under date of May 9 they wrote appellant in part as follows: ''Not hearing from you in regard to coming or sending some one here to check this mine equipment and assess the value of it, I will write you again. Now, Mr. Garrett, I don't know why you have not attended to this matter, as I think it is of importance to both of us, as I have told you in my last letter that I was not going to operate the Denning Coal Company any more, and have informed the Western Coal & Mining Company to that effect, as you have not got any coal here that can be worked at this mine. Now I have been staying here all of this week thinking you would be here or send some one to check me out, but have not heard from you.''

On May 20 he wrote appellant that: ''I am very sorry to say that I have not got the money to pay up this back royalty. The longer I try to run this property the further I get behind, and I cannot waste any more time with it, and have asked you to send some one to check it up so you can dispose of it or junk it, whatever you want to do with it. * * * Now, Mr. Garrett, you have not got any coal leased here that can be worked without a high cost, and the mine run coal is too cheap to try to work it any more, and I want you to get your mines back in your hands right away.''

He wrote many other letters to the same effect.

In June, 1925, appellant's witness, Shores, was sent to Denning, and made a check and inventory of the property turned over to Lewis & Sly, and the property turned back to appellant, and the valuation placed on the property that was missing and not returned by appellees totaled $4,229.93, and both appellees signed the list attest-

ing its correctness. Appellant's traveling auditor testified that appellees were indebted to it for unpaid royalties and other obligations, exclusive of the unreturned property above mentioned, in the sum of $3,757.15.

The case was tried to a jury on the complaint of appellant and the cross-complaint of appellees, which resulted in a verdict and judgment for the appellees on their cross-complaint in the sum of $6,750.

Appellant requested the court to instruct the jury that appellees were not entitled to recover any damages on their cross-complaint in this action, and that their verdict on this point should be in favor of appellant. The court refused to grant this request, and this is the first assignment made by appellant for a reversal of this case. We think the court should have granted this request, for the reason that the undisputed testimony of appellees shows a voluntary surrender and abandonment of the property and their rights under the lease with appellant. The appellee James A. Lewis admits that he wrote all the letters heretofore set out and many others too numerous to set out herein, but attempts to explain the meaning of them. However, their meaning is obvious, and needs no explanation. They show conclusively that appellees have not been damaged, but, on the contrary, were losing money in the operation of the mines. We are therefore of the opinion that there was nothing to submit to the jury on appellees' cross-complaint, for the reason that they had already abandoned the mine long before they claimed to have been evicted by virtue of an injunction issued in June, 1925. The junior Mr. Lewis had quit the mines and gone to work on the highways, and the other Mr. Lewis was constantly begging to be relieved.

For this error the judgment will be reversed, and the cause remanded for a new trial on the issue as to the amount of appellees' indebtedness to appellant on its complaint.